44 C.C.P.A. (Patents).

Frank A. HOWARD, Appellant,
v.
Clarence E. SNYDER, Appellee
(two cases).

Patent Appeals Nos. 6286, 6287.

United States Court of Customs and Patent Appeals.
June 4, 1957.

1. An opthalmometer is defined as an instrument for measuring the curvature of the cornea.

**260**

Kenyon & Kenyon, New York City (Theodore S. Kenyon, John A. Reilly, New York City and Edward B. Beale, Washington, D. C., of counsel), for appellant.

Harold S. Meyer, Akron, Ohio (Gordon W. Daisley, Washington, D. C., of counsel), for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, RICH, and JACKSON (retired), Judges.

RICH, Judge.

These are appeals in two interferences from two decisions of the Board of Patent Interferences of the United States Patent Office. The two appeals are presented to us on a consolidated record.

Each interference involves Snyder application serial No. 81,731, filed March 16, 1949, for "Tire Safety Wall" and Howard application serial No. 134,957, filed December 24, 1949, for "Pneumatic Tire." It will be seen that Snyder has the earlier filing date.

Interference No. 85,747 involved three counts and originally included three other parties in addition to Snyder and Howard. Priority was awarded to Howard on count 3 and to Snyder as to counts 1 and 2. The two latter counts are before us on this appeal.

Interference No. 85,748 involved two counts and originally included one other party. Snyder was awarded priority as to both counts and Howard's appeal brings them both before us.

In both interferences all parties other than Snyder and Howard have been eliminated by judgments on the record prior to final hearing.

The invention relates to tubeless tires for automobiles, more particularly to a safety wall, inner casing, or "diaphragm" for such tires, the purpose of which is described in Howard's brief as follows:

"The diaphragm divides the interior space between the tire and the rim into inner and outer air chambers, with a restricted intercommunicating air passage.—[In some exhibits, a small metal plug in the diaphragm with a pin hole in it.] In the event of a blow-out the diaphragm is designed to retain sufficient air in the inner chamber to prevent sudden and complete collapse of the tire, and to afford the driver an opportunity to bring the car to a safe stop before the tire goes altogether flat."

In each interference Howard alleged no date in his preliminary statement prior to Snyder's filing date in consequence of which Howard was placed under orders to show cause why judgment on the record should not be entered against him.

To escape from this potentially complete defeat on priority, Howard counterattacked with a motion to dissolve on the ground, in the words of his brief, "that Snyder's application does not disclose any operative structure within the counts." Stated the other way around, in Snyder's words, the ground was that "the interference counts are inapplicable to any operative structure diclosed by Snyder."

Howard was granted leave to take testimony for the purpose of substanti-

ating his claim that the disclosures of Snyder were inoperative and both parties have presented extensive proofs of *inter partes* tests, and work preliminary thereto which resulted in a printed record in excess of 1,300 pages. Briefing this massive record has taken about 200 pages. Notwithstanding this deluge of print, together with a small room filled with paper exhibits and tires in various stages of destruction, the principal legal question presented to us had a very simple solution which will not require much space because we shall not go into many of the matters which, though interesting, are unnecessary to decision.

In these interferences the question is not which one of two parties is going to get the patent on an invention, for there are differences between the Snyder and Howard structures. Indeed, it seems clear to us that Howard has improved upon Snyder. As stated above, Howard has been awarded priority as to count 3 in interference '747 and, as appears from his brief, the third party in interference '748 moved to add further counts which did not read on Snyder, were therefore placed in a separate interference and now stand awarded to Howard. So Howard is not in the position of being denied patent protection *for his invention* but is here contesting the right to certain broad claims which have been held to read on subject matter common to Snyder and Howard and which, if patented to Snyder, would dominate Howard. It is therefore not quite accurate for Howard to say, as he does in an impassioned peroration to his excellent brief, that the decision of the board makes Snyder "the owner of what Howard invented." The question is simply who gets the broad counts in interference.

A brief word picture of the two inventions will facilitate further discussion. As is well known, tubeless automobile tires are mounted on drop-center rims with the bead portions of the tires seated in the outer rim channels, spaced apart, with the outer faces of their bead portions pressed against the rim flanges by pneumatic pressure. Each of the parties devised a safety wall (which term we shall use hereinafter) to be mounted inside of such tires. Snyder's is C-shaped in cross-section, its radially inward edges being turned outwardly to form two flaps which, in use, are positioned between the rim and the rim-engaging portions of the tire beads. Thus the air space inside the tire is divided into two chambers, one in cross-section being a crescent-shaped space between the safety wall and the tire, and the other being a space within the safety wall. As mentioned above, the safety wall has a small hole in it which normally equalizes the pressure in the two chambers and also retards the total collapse of the tire, in case of a blowout or the like, by restricting the outflow of air. Howard's safety wall, which he called an auxiliary or supplementary ring, differs from Snyder's only in that the edge portions extend beyond the point where Snyder's flaps stop, in a radially outward direction, so that they have radial flanges which, in use, lie between the outer faces of the tire beads and the rim flanges. Howard called his structure an "omega ring" because, in cross-section, it looks like the Greek capital letter omega. The extent of these side flanges, as shown in the Howard application, is such that they just about reach the edges of the rim of the straight-side type shown in his drawings. His safety wall thus has edge portions in the shape of annular channels in which the tire beads are seated. When the tire is inflated there is, therefore, axial pressure which squeezes the safety wall flanges against the rim flanges, a result not obtained with the Snyder structure. The term "axial" in this context refers to directions parallel to the axle of a wheel on which the tire is mounted and the term "radial" refers to directions in a plane normal thereto, or at right angles to the axle. These safety walls are made of rubberized tire fabric or cord so as to be inextensible and flexible.

The interferences were set up, of course, on the basis that the four counts before us all read on the disclosures of both parties. It seems unnecessary to quote any count in full because the issues all revolve around the edge portions or regions of the safety walls. The counts are directed to combinations including rims, tires and safety walls and define different parts thereof in different ways. Howard has designated the two counts in interference '747 as the "edge counts", these counts specifying that the safety walls terminate in "peripheral edges," their significant portions reading as follows:

"Count 1

" * * * a continuous pneumatically impenetrable seal between the spaced *edge regions* of said wall and the bead portions of said outer casing * * *."

"Count 2

" * * * means for supporting said inner casing at the spaced *edge regions* thereof in air tight relation with said outer casing adjacent the bead portions thereof * * *."

The "outer casing" is, of course, the tire. The inner casing is the safety wall. The counts in interference '748 are called "flap counts" and their significant portions read as follows:

"Count 1

" * * * retaining *flaps* extending in the axial direction for disposition between the rim and the bead portions * * *."

"Count 2

" * * * retaining *flaps* extending in the axial direction and anchored to said bead portion in conforming relation against the radially innermost faces of the bead portions * * *."

On this background we shall now consider Howard's basic contention that "Snyder's application does not disclose any operative structure within the counts." This proposition, the basis of the motions to dissolve the interferences on the ground Snyder has no right to make the counts, breaks down into two questions: (1) Does Snyder disclose an operative structure?; and (2) Does that structure come within the counts? We shall consider them in order.

Our task is simplified by the unqualified admission by Howard, in his brief and at oral argument, that a tubeless tire having a Snyder safety wall attached thereto by vulcanizing its flaps to the under surfaces of the bead portions of the tire (the portions which rest on the flaps when assembled) is operative. But Howard contends that such a structure is not disclosed by Snyder, resting this contention on his interpretation of the Snyder disclosure. The language relied on is in the following passages from Snyder's specification:

"The safety wall 10 has an outer portion 11 with an arcuate cross-section and is open at the inner circumference. The resulting edges 12,12 of the safety wall have outwardly extending retaining flaps 13,13 which are preferably circumferentially continuous for disposition between the rim engaging faces of bead portions 14,14 of a tire 15 and abutting rim flanges 16,16 of a rim 17 as shown in Fig. 2.

*    *    *    *    *    *

"The edges 12,12 of the safety wall 10 are preferably adhesively anchored to the bead portions 14,14 or to the inner peripheral wall portion of the tire or to both as by a suitable cement 24 or by vulcanization to facilitate mounting of the tire 15 and safety wall on the rim 17."

In the absence of a drawing in this opinion, we note that the lead lines designating the edges 12 are directed to the creases or folds which are the junctions between the C-shaped outer portion 11 and the flaps 14 and that the lead line for the cement 24 is directed to a stippled area which appears in the drawing

only on the outer face of the safety wall adjacent one flap, which area is about as wide as the flap, the perspective being such that without another drawing no adhesive could be shown on the side of the flap toward the tire bead.

Howard's contention is that this disclosure does not teach cementing or vulcanizing the flaps to the underside of the bead portions. This same argument was presented to the board on a petition for reconsideration in response to which the board said, "The issue now raised comes as a surprise in the light of the record." It pointed out that up to that time Howard had repeatedly *asserted* that Snyder discloses flaps vulcanized to the under surfaces of the beads. It then decided the point in language with which we fully agree and which expresses exactly our thoughts as formulated on the basis of a study of the Snyder disclosure before we read what the board had said, namely:

> "This interpretation practically limits the edges to a line contact with the bead. That the term 'edge' has a broader connotation in this case is believed evident in the quoted matter, which specifies that the edges can be bonded to the bead portions *or* to the inner side wall portion of the tire *or to both*. This in our opinion justifies reading the edge as inclusive of the flap, as the party Howard has done throughout this case. This is consistent with the use of the term 'edge' in the counts, where it obviously designates the flaps."

Since the vulcanized flap structure admittedly is operative and since we agree with the board's conclusion that it is disclosed by Snyder, we have disposed of the proposition that Snyder does not disclose an operative structure and turn now to the question of whether that structure comes within the counts, as the board held it did.

Howard's ingenious argument on this point somewhat resembles prestidigitation. It is that if the flaps are vulcan-

ized to the tire beads they vanish and so there are no longer any flaps on which the counts can read. After pointing out that the "edge counts" of interference '747 call for "peripheral edges" and the "flap counts" of '748 call for flaps, Howard's brief puts it this way, in paraphrase: Flaps vulcanized to the beads no longer exist as "flaps" or "edges" separately identifiable as such, and the safety wall therefore no longer would have "peripheral edges" of its own or "flaps" of its own in accordance with those terms of the counts. Vulcanization of the flaps to the tire beads "merges" or "integrates" them therewith and they lose their separate identity. Webster's Dictionary is enlisted for support in that it defines a flap as something "that hangs loose."

If all this be true, then an envelope which has a gummed flap no longer has one when sealed, an inner tube which has a patch cemented or vulcanized to it does not in fact have a patch and Snyder's safety wall has no flap once the flap is merely stuck to the tire bead for it no longer hangs loose. We cannot agree with Howard that the counts "call for only physical compressive contact between the 'edge regions' or 'flaps' of the diaphragm and the 'bead portions' of the tire casing". We think the words of the counts quoted above make it amply clear that the use of some method of adhesion is not excluded. They speak of a "pneumatically impenetrable seal," a "means for supporting * * * in air tight relation," "disposition between the rim and the bead" and "flaps anchored to said bead portion." Some, at least, of these expressions would, in themselves, almost suggest an adhesive in addition to "physical compressive contact." Vulcanization is one of the commonest methods of adhesion in the rubber fabricator's bag of tricks. As far as we have seen, the only method of vulcanization used in these cases was to apply "vulcanizing cement" and heat which makes a less easily broken bond than "non-vulcanizing cement." Howard's argument makes the further point

that the *most* useful form of the invention is one which is *easily* removed to give access to the inside of the tire for repair and that to so construe the counts as to read on a structure where this cannot be done is improper. He apparently forgets that his own application says of his "omega ring" that "It may, however, be an *integral* part of the tire casing, *permanently* cemented or *vulcanized* in place." (Emphasis ours.) Operativeness is not dependent on producing the best possible form or one which achieves every object mentioned in the specification.

We have said enough to show why we agree with the board in its view (on which the board said it had no doubts) "that the safety wall retains its flaps and peripheral edges as such after vulcanization to the tire beads" and with its conclusion "that the vulcanized form satisfies counts 1 and 2" of interference '747. In interference '748 the board said, "It seems, therefore, that the quality of hanging loose is not an ever-present requirement in a flap. We believe that the flap still exists as such even when fixed to the bead and the counts read on the vulcanized form." Again we agree.

In deciding that the board committed no error in deciding the issues on the grounds on which it based its decisions, we have disposed of two groups of Howard's assigned errors. A third group of errors relates to the issue of the operativeness of embodiments of the Snyder invention other than the admittedly operative vulcanized embodiment, embodiments in which the flaps were either cemented (apparently with non-vulcanizing cement) to the tire beads or not cemented at all. The board passed on this issue only "To provide for the contingency that a higher tribunal may disagree with our holdings," an event which has not occurred. We therefore find it unnecessary to discuss this issue and we express neither agreement nor disagreement with what the board said about it.

One remaining assignment of error relates to Howard's motion that certain exhibits be received in evidence, denied by the board. Since we have found it unnecessary to consider the testimony of Snyder in connection with which the exhibits were offered, this question is now moot, for which reason alone we shall not disturb the board's ruling.

For the reasons hereinabove stated, the decisions of the Board of Patent Interferences are affirmed.

*Affirmed.*

WORLEY, J., because of illness, was not present at the argument of this case and did not participate in the decision.

JACKSON, J., retired, recalled to participate herein in place of COLE, J., absent because of illness.